UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                          CASE NO. 8:19-CR-309-T-23CPT

YOLANDA HERRERA

## UNITED STATES' SENTENCING MEMORANDUM

Pursuant to this Court's Acceptance of Plea of Guilty and Adjudication of Guilt, the United States files this sentencing memorandum requesting a Guidelines sentence for Yolanda Herrera. The United States also concurs with United States probation that Herrera warrants a three-level role adjustment for being a "manager of supervisor" pursuant to USSG §3B1.1(b), but agrees with counsel for Herrera that she does not qualify as a career offender under §4B.1.1.

### I.  Procedural Background

On July 25, 2019, a federal grand jury in the Middle District of Florida returned a two-count indictment against Yolanda Herrera and Brandonlee Llanot. Count One charges Herrera with conspiracy to distribute and possess with intent to distribute 500 grams of methamphetamine and one kilogram of heroin, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(i), (b)(1)(A)(viii), and 846. Count Two charges Herrera with attempted possession with intent to distribute 500 grams of methamphetamine and one kilogram of heroin, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(i), (b)(1)(A)(viii).

On June 3, 2020, Herrera pleaded guilty pursuant to a plea agreement to Counts One and Two of the Indictment. Herrera is scheduled to be sentenced on February 22, 2021.

## II.     Presentence Investigation Report

On February 16, 2020, probation issued its final Presentence Investigation Report as to the defendant. Doc. 70. Pursuant to the PSR, Herrera's applicable Guideline range for the underlying offense is 360 months to life. Probation's calculated range includes a three-level reduction for acceptance of responsibility. The PSR also includes a two-level increase for the importation of methamphetamines into the United States pursuant to USSG §2D1.1(b)(5), and a three-level increase for being a "manager or supervisor" pursuant to USSG §3B1.1(a). The PSR also states that, per USSG §4B.1.1, Herrera is a career offender, and therefore a criminal history category VI. The applicable period of supervised release is at least five years, up to life under 21 U.S.C. § 841(b)(1)(A).

Herrera made several objections to the initial PSR. In an attempt to resolve those objections, the parties engaged in several good faith conversations, and resolved some of the objections. Nevertheless, several of Herrera's objections remain outstanding. They include objections to 1) Herrera receiving a three-level role enhancement pursuant to §3B1.1(a); and 2) designation as a career offender pursuant to §4B.1.1. For the reasons discussed below, the United States agrees with probation that Herrera warrants a three-level role adjustment for being a "manager or supervisor" pursuant to USSG §3B1.1(b), but concurs with counsel for Herrera that

Herrera is not a career offender pursuant to §4B.1.1. On February 11, 2020, the United States requested to U.S. Probation that specific facts be included in the final PSR. Some of the facts were not included, and the United States filed factual objections. See Attachment A.

### III. Factual Background

On March 8, 2019, a container shipped from Almira, Mexico on board the vessel *Leticia.* PSR Doc. 70 ¶10. It arrived at the Port of Tampa on March 11, 2019, where it was examined due to inconsistencies in the manifested information. *Id*. The manifest indicated Brandonlee Llanot as the consignee. *Id.* Homeland Security Agents ("HSI") agents found records reflecting Llanot had been issued a pass to the cargo dock area by the Port of Tampa. ¶11. The records showed that seven shipments between October 2018 and March 2019 arrived in Tampa from Mexico, listing stone fountains/stone marble as the contents. *Id*.

HSI agents examined the container, revealing five individually wrapped stone pallets wrapped on top of wooden pallets. ¶12.



Each of the five pallets contained numerous stone blocks that, when x-rayed, revealed anomalies that were inconsistent with some of the other stone blocks on the same pallet. *Id.*



Inside these suspect stones, agents found a large square package that was shrink wrapped with black carbon paper containing a white, clear crystalized substance that field tested positive for methamphetamine, while others field tested positive for

heroin. *Id.* In total, 12 blocks, from one of the stone pallets, contained 50.18 kilograms of methamphetamine and 3.1 kilograms of heroin. *Id.* The container was repackaged, and a GPS tracker and trip wire device were included. ¶13.

On March 15, 2019, Llanot entered the cargo area at the Port of Tampa, transferring the cargo aboard the *Leticia* from the container to a rental Penske moving truck. ¶14. Law Enforcement followed Llanot as he drove the Penske truck from Tampa to Atlanta. [1] On the way to Atlanta, HSI observed Llanot as he drove the Penske truck to a Walmart parking lot, where Herrera provided him with two duffle bags and a cooler. *Id.* Herrera did not get into the truck, but instead flew to Atlanta, arriving on March 16, 2019. ¶15. The Penske rental truck was leased by Herrera on March 14, 2019, and was to be returned on March 18, 2019. ¶14.

On March 16, 2019, at approximately 1:00 a.m., the Penske rental truck arrived at a residence in Atlanta. Flight records obtained from Southwest show that on March 15, 2019, at approximately 9:40 p.m., Herrera flew from Tampa to Atlanta, arriving in Atlanta at approximately 11:15 p.m., less than an hour before the Penske truck arrived in Atlanta. [2] on the same day, at approximately 10:00 a.m. agents received a trip wire alert that the masonry type blocks had been tampered with and observed a red Ford pick-up truck, parked in the driveway of the residence. The truck was parked

---

[1] Objection 1: Paragraph 14 of the PSR does not specify that the type of truck used was a "Penske" rental truck or that law enforcement followed Llanot as he drove to Atlanta.
[2] Objection 2: Paragraph 15 of the PSR does not specify that times that Herrera or the Penske truck arrived in Atlanta. Nor does it include the time that agents received the trip wire notification.

5

blocking the Penske rental truck—which was backed into the residence. Agents approached the residence, and they observed Nestor Vazquez-Morales and Adan Martinez-Onofree behind the rental truck. The back of the Penske truck was open, and the packages inside the truck had been opened. [3] Cellphone records for the co-conspirators revealed that members of the conspiracy were actively planning and coordinating the pickup of narcotics from the residence. ¶15

Agents searched residence where the Penske truck was parked. The search resulted in the discovery and seizure of approximately two kilograms of heroin, three firearms (1 riffle and 2 handguns), $12,725.00 in U.S. currency and one stone block that was exactly as the stone blocks used to conceal the narcotics in the cargo. ¶16. The stone block was found in the backyard of the residence, by a shed, completely visible and out in the open. Agents also found some clear plastic wrapping in the backyard. That wrapping contained a square white sticker with black letters displaying the message "Hecho en Mexico" which stands for "Made in Mexico." This same sticker was also present in the discovered narcotics from March 11, 2019. [4]

HSI agents learned that Herrera rented six Penske moving trucks between October 2018 and March 2019. ¶ 17. GPS data showed that all of the Penske trucks were rented in Tampa, Florida, and driven to Atlanta, Georgia, where they were

---

[3] Objection 3: Paragraph 15 of The PSR does not specify the time in which agents uncovered the trucks, the individuals who were observed opening them, or that the packages had been opened.

[4] Objection 4: Paragraph 16 of The PSR does not include an information regarding the clear plastic wrappings found in the backyard of the residence, or how it was the same sticker found in the narcotics seized at the Port of Tampa.

returned. *Id.* Flight records revealed that the dates when Herrera flew from Tampa to Atlanta corresponded with the dates that the Penske trucks were rented. *Id.*

On September 18, 2019, **Herrera** was arrested in Atlanta. During her *Post-Miranda* interview, which was audio recorded, **Herrera** admitted that she:

- was hired and paid by a woman named "Suzie" to coordinate, supervise and organize the transportation of narcotics that had been sent from Mexico to Tampa, and deliver the narcotics to Georgia. ¶18.

- hired and paid Llanot as a driver to transport the narcotics from the Port of Tampa, and deliver the narcotics to Atlanta. ¶18.

- to having accompanied Llanot on at least one previous narcotics trip from Tampa to Georgia. ¶18.

- knowing that Llanot later made additional narcotics trips alone. ¶18.

Federal agents later searched Herrera's home and in her backyard found a stone block. That stone block was identical and contained the same "Made in Mexico" sticker as the stone fountains shipped on the *Leticia*, as well as the one found in the backyard of the residence on March 16, 2019. Herrera admitted that she received the stone block recovered in her home as a form of payment from a previous load.[5]

### IV. Herrera Warrants a Role Enhancement Under USSG §3B1.1(a)

Pursuant to USSG §3B1.1, a defendant role in the offense may be increased by 4 levels if the defendant was an organizer or leader, and the criminal activity

---

[5] Objection 5: Paragraph 18 of the PSR does not include any of the facts regarding the stone block found in Herrera's home or her statements regarding that stone block.

involved five or more participants, or was otherwise extensive; 3 levels if the defendant was a manager or supervisor, and the criminal activity involved five or more participants, or was otherwise extensive; or 2 levels if the defendant was an organizer, leader, manager, or supervisor in any criminal activity.

The United States asserts that Herrera was, at the very least, a manager or supervisor, and that the criminal activity involved five or more participants, or was otherwise extensive. [6] Counsel for the defense originally did not appear to object to Herrera's characterization as a manager or supervisor under §3B1.1. Rather, counsel appeared to argue that the criminal activity did not involve five or more participants and was not otherwise extensive. Nevertheless, in an abundance of caution, the United States will address why Herrera qualifies as a "manager or supervisor" and then address how the criminal activity involved five or more participants and was otherwise extensive.

---

[6] Herrera could also conceivably warrant a leader or organizer enchantment. See *United States v. Ndiaye,* 434 F.3d 1270, 1304 (11th Cir. 2006)(Evidence that the defendant recruited and instructed participants in the conspiracy is sufficient to support a leadership enhancement);*United States v. Dugarov*, 622 F. App'x 823, 828 (11th Cir. 2015)(The defendant does not have to be the sole leader or kingpin of the conspiracy in order to be considered an organizer or leader within the meaning of the Guidelines); *United States v. Ramirez*, 426 F.3d 1344, 1355 (11th Cir. 2005)(upholding organizer or leader enhancement because defendant was not only the captain of the go-fast vessel, but because he also knew the destination of the boat for delivery of the cocaine, gave orders to the crew and oversaw the driving and refueling); *United States v. Yeager*, 331 F.3d 1226 (11th Cir. 2003)(A leader/organizer enhancement may apply where the defendant was the leader or organizer of only one person); *United States v. Jones*, 539 F. App'x 920, 921 (11th Cir. 2013)("There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy.").

### A. Manager or Supervisor

The 11th Circuit has upheld §3B1.1 "manager or supervisor" enhancements when the convicted defendant "had decision-making authority and exercised control." *United States v. Ramirez*, 426 F.3d 1344, 1355 (11th Cir. 2005), citing *United States v. Suarez,* 313 F.3d 1287, 1294 (11th Cir.2002). To qualify for the manager or supervisor enhancement, "the defendant [must have] asserted control or influence over at least one other participant in the crime." *United States v. Vasquez*, 486 F. App'x 830, 833 (11th Cir. 2012), citing *United States v. Campa,* 529 F.3d 980, 1013 (11th Cir. 2008). The Court has held "many times that a defendant's recruitment of co-conspirators supports a §3B1.1 enhancement." *United States v. Vasquez*, 486 F. App'x 830, 835 (11th Cir. 2012). Evidence sufficient for aggravating role where defendant "(1) actively recruited two individuals to transport drugs, (2) arranged one of those recruited individuals to transport cocaine, (3) directly paid at least one of those individuals for transporting cocaine, and (4) was, in turn, paid for his recruitment and supervision of individuals in that drug conspiracy." *United States v. Perry*, 340 F.3d 1216, 1217–18 (11th Cir. 2003).

Herrera admitted that she was hired and paid by a woman named "Suzie" to coordinate, supervise and organize the transportation of narcotics that had been sent from Mexico to Tampa, and deliver the narcotics to Georgia. Doc. 70. ¶18. She also admitted to having hired Llanot as a driver to transport the narcotics from the Port of Tampa and deliver the narcotics to Atlanta. *Id.* She admitted to having accompanied

Llanot on at least one previous narcotics trip. *Id*. Between October 2018 and March 2019, Herrera also rented six Penske moving trucks, including the truck that transported 50 kilos of methamphetamine to Atlanta. ¶ 17. Herrera's Penske rentals also coincide with Herrera's flights to Tampa. *Id*. Herrera, therefore, clearly had direct, hands on, repeated involvement with this conspiracy, made decisions about the conspiracy, for the benefit of the conspiracy and hired at least one individual to carry out this conspiracy. At the very least, Herrera was a manager or supervisor within that conspiracy.

### B. Five or More Participants

A "participant" is someone "who is criminally responsible for the commission of the offense, but need not have been convicted." §3B1.1 cmt. n.1. When determining the number of participants, the defendant is considered to be one of the five. *United States v. Holland*, 22 F.3d 1040, 1045 (11th Cir. 1994), citing *United States v. Rodriguez,* 981 F.2d 1199, 1200 (11th Cir.). In the course of this investigation, law enforcement identified several participants. Two of whom, Nestor Vazque-Morales and Adan Martinez-Onofre, were already convicted and sentenced for their conduct in this conspiracy. [7] A third, Brandon Llanot has been indicted and is pending arrest. Doc. 1. Additionally, in a *post-Miranda* interview, Herrera admitted to the involvement of at least two other participants. First, she admitted that she was hired

---

[7] On July 23, 2020, the Honorable Charlene E. Honeywell sentenced Nestor Vazquez Morales to 188-months imprisonment. The next, day, July 24, 2020, Martinez Onofre was sentenced to 70-months imprisonment. *United States v. Nestor Vazquez-Morales, 8:19-cr-163-T-36AAS*. Docs. 143 and 146.

and paid by a woman named "Susie," who lived in Georgia, to coordinate, supervise and organize the transportation of narcotics that had been sent from Mexico to Tampa, and deliver the narcotics to Georgia. Second, Herrera stated that the narcotics she transported were supplied and owned by a relative of Susie's, who she identified as "Julian." Under a simple number-based approach, the criminal activity involved at least six participants, or Herrera, Llanot, Vazquez-Morales, Martinez-Onofree, "Susie" and "Julian."

### C. Otherwise Extensive

Even assuming that there were not five participants, Herrera would still warrant a three-level role enhancement because the criminal activity was "otherwise extensive" pursuant to §3B1.1(b). "In assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered." §3B1.1 cmt. n.3. For example, "a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive." *Id.* In this case, it is undisputed that Herrera and her co-conspirators used the services of outsiders in carrying out their objective. The outsiders undoubtably included the crew of the *Leticia,* who unknowingly loaded, and transported controlled substances from Mexico to Tampa on several occasions. And also includes members of the conspiracy whose participants are in Mexico. From those who planned and organized the venture, to those who carefully packaged and hid the narcotics inside the stone fountains to avoid detection.

Under the "otherwise extensive" standard, no set number of criminally responsible participants is required. *United States v. Holland*, 22 F.3d 1040, 1045 (11th Cir. 1994). The 11th Circuit "does not employ a precise definition for the 'otherwise extensive' standard." *Holland*, 22 F.3d at 1045. "The plain text of §3B1.1(b) indicates that the subject modified by the adjectival phrase 'otherwise extensive' is not the relative degree or amount of involvement vis-à-vis other codefendants but rather the quality of the 'criminal activity' itself." *United States v. Stroman*, 661 F. App'x 600, 604 (11th Cir. 2016). Therefore, "the phrase 'other extensive' refers to 'other' ways— besides the number of participants—that 'criminal activity' may be considered 'extensive.'" *Id*.

Courts have however, identified several factors relevant to the extensiveness determination, including "the length and scope of the criminal activity as well as the number of persons involved." *United States v. Zada*, 706 F. App'x 500, 509 (11th Cir. 2017). See *United States v. Sosa*, 777 F.3d 1279, 1301–02 (11th Cir. 2015) (holding that a Medicaid fraud scheme was otherwise extensive where, among other things, the defendant recruited patients, falsified medical records, and received almost $119,000"); *United States v. Rodriguez*, 981 F.2d 1199, 1200 & n.3 (11th Cir. 1993) (concluding that criminal activity was "otherwise extensive" based on its extensive geographic reach and the amount of cocaine involved").

The length and scope of Herrera's criminal activity is vast. As discussed before, Herrera admitted to hiring Brandon Llanot for the very purpose of transporting and distributing massive amounts of narcotics that were being imported

into the United States. Herrera admitted to having accompanied Llanot on at least one previous occasion, and to knowing that Llanot made additional narcotics trips by himself. Herrera actively communicated with co-conspirators as the narcotics traveled to Atlanta, updated them on its delivery and planned for its transportation. Not only did she hire and pay the individual required to transport the narcotics, but she also rented the Penske trucks they needed.

Between October 2018, and March 2019, Herrera rented six Penske trucks. During the same time period, Llanot ordered seven shipments from the *Leticia*. Flight records show that Herrera flew to Tampa on November 28, 2018, (from Atlanta) December 18, 2018, (from Atlanta) and January 25, 2019 (from Mexico). These dates coincide with cargo ordered by Llanot, shipped on the *Leticia*, all of which departed from Mexico, arrived in Tampa, and were manifested as stone fountains/stone marble. [8] GPS data obtained from the Penske truck rentals show that the trucks were always picked up in Tampa, dropped off in Atlanta, with stops in the same Atlanta residence were the narcotics were found. As such, Herrera's criminal activity was "otherwise extensive" pursuant to §3B1.1(b).

## IV. Career offender

Pursuant to USSG §4B1.1, a defendant is a career offender if, after 18 years of age, the defendant has at least two prior felony convictions that are either crimes of violent or controlled substances offences. For purposes of the career-offender

---

[8] See the chart in Doc. 37 at pg. 26.

enhancement, at least two of the defendant's prior convictions must be counted separately under the provisions of §4A1.1(a), (b) or (c). USSG §4B1.2(c). See *United States v. Hansley,* 54 F.3d 709,715 (11th Cir.1995).

Under 4A1.2(e)(1), a prior conviction for which the defendant received a "sentence of imprisonment exceeding one year and one month" earns criminal history points if the prior sentence was "imposed within fifteen years of the defendant's commencement of the instant offense." *Id*. Courts also instructed to "also count any prior sentence of imprisonment exceeding one year and one month, whenever imposed, that resulted in the defendant being incarcerated during any part of such fifteen-year period." *Id.*

The parties agree that Herrera has been convicted of two felony offenses, that is, importation of a controlled substance in 1999, and possession with the intent to distribute controlled substances in 2001, both of which occurred after she was 18 year old and which are controlled substances offenses. The parties also agree that Herrera's conviction for possessing with intent to distribute controlled substances in 2001 qualifies as a "career offender" conviction under USSG §4B1.1. The only dispute, therefore, is whether Herrera's 1999 conviction for importation of a controlled substance qualifies for career offender designation.

On September 17, 1999, Herrera was sentenced to 27-months imprisonment in the Western District of Texas for importation of controlled substances.[9] On July 11,

---

[9] The date of conviction is unknown.

2001, approximately 22-months into her sentence, and with approximately 5 months left, Herrera escaped custody. Less than a month later, on July 29, 2001, Herrera was arrested for possession with the intent to distribute controlled substances. This second arrest would later lead to the 2001 possession with intent to distribute controlled substances conviction that the parties agree constitutes a proper career offender conviction. Herrera would later be sentenced to 60-months imprisonment for the new charge—possession with intent to distribute—to be served concurrently with an escape from a federal institution conviction.

If Herrera had served her original 27-month sentence for importation of a controlled substance in 1999, she would have been released from imprisonment no later than December 27, 2001. The United States probation office concedes, and all parties agree, that, "had Herrera served out her completed sentence…the sentence would not have fallen into the applicable [15 year] time period." Doc. 70 Addendum. pg. 3.

To determine whether an offense falls within the applicable time period to earn a criminal history point and qualify as a predicate offense for purposes of the career-offender enhancement, "we count back from the commencement of the instant offense—when the defendant began the 'relevant conduct.'" *United States v. Cornog*, 945 F. 2d 1504, 1509 (11th Cir. 1991). The indictment returned against Herrera stated that the conspiracy began "on an unknown date, but no later than on or about March 8, 2019." Doc. 1. Indeed, in the plea agreement, Herrera admitted that the conspiracy began in or around October 2018. Doc. 37, pgs. 25-26. As such,

15

the Court must count back from October 2018, but from no later than March 8, 2019. Counting back from those dates, Herrera's importation of marijuana convictions would count if she had been sentenced, or had served any period of incarceration after October 2003.

Fortunately for Herrera, she was arrested less than a month after she escaped, on July 29, 2001. As defense correctly points out, the five-month Herrera had left on her sentence would have run out well before October 2003. Although probation is correct that Herrera was in custody after October 2003, she was in custody serving a 60-month term of imprisonment for the new conviction—possession with intent to distribute—and escape, not the original importation of controlled substance conviction. Herrera finished serving her 60-month sentence and was released on April 29, 2005. As such, her 60-month sentence for possession with intent to distribute pushed that conviction to within the applicable 15 years, or after October 2003, thereby making it a qualifying offense under career offender. That sentence did not however, change or modify Herrera's sentence for the original importation of controlled substance conviction, it merely began a new term of imprisonment. To piggyback on the 60-month term of imprisonment would effectively use the same term of imprisonment for two separate convictions. See USSG §4B1.2(c)(2). ("For purposes of the career-offender enhancement, at least two of the defendant's prior convictions must be counted separately under the provisions of §4A1.1(a), (b) or (c). USSG §4B1.2(c)."). Herrera is lucky that she did not remain a fugitive. Had she been arrested within five months of October 2003, she would have been "incarcerated

during any part of such fifteen-year period," and the offense would have counted for purposes of career offender.

Herrera's offense level before career offender designation is 43, or higher than an offense level 38 prescribed by a career offender designation. As such, should the Court agree that Herrera is not a career offender, her offense level would remain unchanged at 43. Herrera's criminal history category, however, would change from category VI to III. Her guideline range would remain 360-months to life.

## VI. United States' Sentencing Position

Herrera's sentencing calculations are based on the 50.18 kilograms of methamphetamine and approximately 3 kilograms of heroin that was on board the *Leticia* on March 11, 2019, and later recovered at a co-conspirator's residence on March 16, 2020. That one shipment of 50 kilograms of methamphetamine, alone, represents the largest seizure of methamphetamine ever recovered at the Port of Tampa. The potential danger to the community and society if these drugs were successfully distributed cannot be overstated.

More troubling of all, the evidence is clear that members of this conspiracy, and Herrera in particular, received shipments of controlled substances on board the *Leticia* from Mexico on at least five previous occasions. This organization showed a continued, unyielding desire to organize the transportation of narcotics into the United States, a craving that did not stop until law enforcement's intervention.

Unfortunately, Herrera's conduct in this case is not an aberration. At 42 years old, Herrera has been convicted of distributing and importing narcotics on at least

three previous occasions in New Mexico, Texas, and now, Florida. Worst of all, Herrera's arrests seem to occur soon after being released from custody. Specifically, on July 7, 1999, Herrera pleaded guilty to possession of marijuana with intent to distribute, and sentenced to probation. Doc. 70. ¶ 36.

A month later, on August 9, 1999, she was arrested again for importation of controlled substances. ¶ 37. While serving a sentence for that conviction, she escaped. *Id*. Three weeks after escaping, she was once against arrested for distributing controlled substances, and released on April 29, 2005. ¶37 and 38. A year and a half after being released, she was arrested again for possessing between 50 and 2,000 pounds of marijuana. ¶ 40.

Section 3553 makes clear that the Court is to impose a sentence that will help promote a respect for the law, provide deterrence to the commission of any future offenses, and protect the public. *See* 18 U.S.C. § 3553. Had Herrera successfully continued to distribute the drugs being transported into the United States, immense harm to others could have arisen from the sale, purchase, and/or use of such a significant quantity of methamphetamines. The United States therefore respectfully submits that a Guidelines sentence will serve Section 3553's various interests.

Respectfully submitted,

MARIA CHAPA LOPEZ
United States Attorney

By: */s/ Diego F. Novaes*
Diego F. Novaes
Assistant United States Attorney
Florida Bar No. 0107376
400 North Tampa Street, Suite 3200
Tampa, Florida 33602
Telephone: (813) 274-6000
Facsimile: (813) 274-6125
E-mail: diego.novaes@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on February 18, 2021, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Gus M. Centrone

>	*/s/ Diego F. Novaes*
>	Diego F. Novaes
>	Assistant United States Attorney
>	Florida Bar No. 0107376
>	400 North Tampa Street, Suite 3200
>	Tampa, Florida 33602
>	Telephone: (813) 274-6000
>	Facsimile: (813) 274-6125
>	E-mail: diego.novaes@usdoj.gov